671 So.2d 175 (1996)
Nicholas R. VENEZIA, Appellant,
v.
Andy EGAN and R. & J. Crane Service, Inc. etc., Appellees.
No. 94-1742.
District Court of Appeal of Florida, Fifth District.
March 1, 1996.
Rehearing Denied April 8, 1996.
*176 Roy D. Wasson, Miami and Hubert C. Childress of Childress and Charpentier, P.A., Melbourne, for Appellant.
Kenneth E. Cohen of Kroll & Tract, P.A., Miami, for Appellees.
ANTOON, Judge.
Nicholas Venezia, an employee of East Coast Welding (ECW), sued R. & J. Crane Services, Inc. and Andy Egan for negligence. R. & J. Crane raised the defense of "borrowed servant immunity" under Florida's Workers' Compensation Law, section 440.11(2), Florida Statutes (1991). Finding, as a matter of law, that Egan was the "borrowed servant" of ECW, the trial court entered final summary judgment in favor of R. & J. Crane and Egan. We reverse.
Venezia, an iron worker, was employed by ECW, a subcontractor on a construction project at St. Joseph Church in Palm Bay. ECW leased a crane from R. & J. Crane for the specific purpose of unloading steel beams from a truck and properly setting them. R. & J. Crane also provided ECW with Egan, a trained crane operator, in the general employment of R. & J. Crane. Prior to commencing work, Egan discussed the details of the job with Venezia and Lambert, another ECW employee. The work then began. Venezia and Lambert hooked the beams to the crane, and Venezia, standing on the flatbed of a truck, gave hand signals to Egan, who operated the crane. According to Venezia, he hooked a 14,000 pound beam to the crane, but before he gave the appropriate hand signal, Egan lifted the beam forcing Venezia to jump off of the truck to avoid being struck by the beam. Venezia was injured when he landed.
After Venezia received workers' compensation benefits through ECW, he instituted this lawsuit against R. & J. Crane and Egan, alleging negligent operation of the crane as the proximate cause of his injury. In response, R. & J. Crane and Egan raised the defense of the borrowed servant immunity doctrine. The trial court entered summary judgment on this issue in favor of R. & J. Crane and Egan, concluding that Egan was the borrowed servant of ECW. The key issue on appeal is whether the court erred in so ruling.
The party moving for summary judgment has the burden to prove conclusively the nonexistence of any genuine issue of material fact. Juno Industries, Inc. v. Heery Intern, 646 So.2d 818, 821 (Fla. 5th *177 DCA 1994). On appellate review, we must view the evidence in the light most favorable to the appellant and must draw all competing inferences in favor of the appellant. Robbins v. Hess, 659 So.2d 424 (Fla. 1st DCA 1995). "If the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined." Moore v. Morris, 475 So.2d 666, 668 (Fla.1985). See also Crandall v. Southwest Florida Blood Bank, Inc., 581 So.2d 593 (Fla. 2d DCA 1991). The instant record contains genuine issues of material fact regarding Egan's status as a borrowed servant of ECW and thus, entry of summary judgment was improper.
In Shelby Mutual Insurance Co. v. Aetna Insurance Co., 246 So.2d 98 (Fla. 1971), our supreme court held that in a situation where a presumption of continuing general employment exists, such presumption can be overcome only upon a clear demonstration that new temporary employment has been substituted for the general employment. The Shelby test for determining whether the presumption in favor of general employment has been overcome, and thereby an employee had become a borrowed servant, was aptly summarized in Crawford v. Florida Steel Corp., 478 So.2d 855, 859 (Fla. 1st DCA 1985), as follows:
The courts have generally agreed that the criteria for determining the existence of an employer-employee relationship for purposes of the "borrowed servant" doctrine are: (1) whether a contract for hire, expressed or implied, exists between the employee and the alleged special employer; (2) whether the work being done at the time of the injury was essentially that of the alleged special employer; and (3) whether the power to control the details of work being done at the time of the accident resided in the alleged special employer. Rumsey, [v. Eastern Distribution, Inc., 445 So.2d 1085 (Fla. 1st DCA 1984)] supra; Hamilton v. Shell Oil Company, 215 So.2d 21 (Fla. 4th DCA 1968), later appealed, 233 So.2d 179 (Fla. 4th DCA 1970), cert. denied, 237 So.2d 762 (Fla. 1970); see generally, 1C Larson, Law of Workmen's Compensation, § 48.00 (1985). The factors referred to are not equal, the first factor being the most important, and the second and third factors being merely indicators of the existence of the first factor. Shelby Mutual Insurance Company v. Aetna Insurance Co., 246 So.2d 98, 101 n. 5 (Fla.1971). Since the contract for hire to be proved is frequently an implied one, factors showing a consensual relationship such as benefit, right of control and payment of compensation are sometimes considered. Id. at 101.
The application of this presumption in favor of continuing general employment in situations involving heavy equipment leased along with an operator was explained by Judge Griffin in Sherrill v. Corbett Cranes Services, Inc., 656 So.2d 181, 186 (Fla. 5th DCA 1995) by reference to the Restatement (Second) of Agency § 227, cmt. c (1958):
A continuance of general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality, and these may be opposed to the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise, permits his servant instrumentality to assist another, is more apt to intend to surrender control.
Stated another way, the presumption of continued general employment makes particularly good sense in those situations where an employee is provided for the specific purpose *178 of operating heavy equipment belonging to the lending employer because the lending employer, who owns expensive and often complex machinery, would naturally prefer to continue control and maintenance of that machinery, and thus be reluctant to lease his equipment without also sending along an employee who has knowledge of the equipment and an interest in seeing that the equipment is used and maintained properly.
Application of the Shelby criteria in the instant case leads us to the conclusion that there is a genuine issue of fact as to whether Egan was the borrowed servant of ECW. First, we address the requirement that there be "a contract for hire" between the employee, Egan, and the special employer, ECW. The record does not include an express contract between Egan and ECW, but R. & J. Crane maintains that an implied contract existed between Egan and ECW, evidenced by a document prepared by R. & J. Crane and signed by ECW. The document, a 5½" by 8" form, indicated that a crane was ordered from R. & J. Crane to "set steel" at an unspecified church in Palm Bay on May 11, 1992, that the work would begin at 8:00 and conclude at 1:30, and that Egan would be the operator of the crane. The document also included the price to be paid to R. & J. Crane, and disclaimers in small print at the bottom. There was no indication concerning the details of the work to be done by Egan, or how and by whom Egan was to be paid. As pointed out by Venezia, the record is unclear as to whether the document existed prior to the accident, or was actually the "job ticket" drafted by Egan at the completion of the job. Moreover, even if the document could be construed as a contract, there is no record evidence that Egan had knowledge of the details of the contract. Shelby provides that such knowledge is critical to the determination of whether Egan was a borrowed servant. Lund v. General Crane, Inc., 638 So.2d 146 (Fla. 4th DCA), rev. denied, 649 So.2d 233 (Fla.1994); Pepperidge Farm, Inc. v. Booher, 446 So.2d 1132 (Fla. 4th DCA 1984), approved, 468 So.2d 985 (Fla.1985). The question also remains as to whether Egan's consent to the new employment was deliberate and informed so as to constitute a bar to an action for negligence. See Sagarino v. Marriott Corporation, 644 So.2d 162 (Fla. 4th DCA 1994).
As for the second prong of the Shelby test, the record is clear that the work being done at the time of Venezia's injury was essentially for the benefit of the alleged special employer, ECW. However, there are serious questions regarding the third prong of the testwhether ECW had the power to control the details of the work being done by Egan. Although the affidavits of representatives of R. & J. Crane and ECW included general statements that Egan was under the control of ECW, the affidavits were void of any detail. Furthermore, the record contains no details as to whether R. & J. Crane told Egan which crane to use on this job. With regard to the issue of control, Egan testified in his deposition that although he conferred with ECW personnel about the details of the lift, he would not necessarily follow their requests if he felt safety was at issue. Egan testified that he "would find out what (a customer) wants to do ... listen to it, and if you think it'sif you agree with it, that's the way you do it. If you think there's a better way or a safer way to do it, you know, you suggest that. And it's ... that's how it's done." He stated that he "always ha[d] the option of stopping." Egan also testified in this regard that he would follow the hand signals of ECW unless he considered them unsafe, and that he would not operate the crane unless the signalman used the "standard crane and derrick signal[s]. The operation of the crane is my responsibility." The facts fail to demonstrate conclusively that ECW had the power to control the details of Egan's work.
In summary, there was not sufficient record evidence to conclusively overcome the presumption of Egan's general employment with R. & J. Crane at the time of the accident. At best, the record evidence presented conflicting inferences as to whether a contract for hire existed between ECW and Egan, and whether ECW had the power to control the details of Egan's expert work as a crane operator. Thus, there were genuine issues of fact as to whether Egan was the borrowed servant of ECW. Because R. & J. Crane and Egan failed to meet the burden of *179 conclusively proving the nonexistence of any genuine issue of material fact, summary judgment was improperly entered.
REVERSED and REMANDED.
DAUKSCH, J., concurs.
HARRIS, J., dissents, with opinion.
HARRIS, Judge, dissenting.
I respectfully dissent.
The real issue in this case is whether it is ever possible by summary judgment to determine that an operator of heavy equipment is a "borrowed servant."[1] If any record can support a summary judgment on this issue, the record before us does.
The supreme court established the law as it generally relates to a crane operator as a borrowed servant in Halifax Paving v. Scott & Jobalia Construction, 565 So.2d 1346, 1347 (Fla.1990):
Florida law long has recognized the "borrowed servant" rule. (Citations omitted). Under this rule, one who borrows and exercises control over the servant or worker of another in effect assumes all liability for the activities of the borrowed servant or worker. Id. We believe the record contains substantial competent evidence to show that the crane operator became a "borrowed servant" within the definition of that term provided in Shelby Mutual Insurance Co. v. Aetna Insurance Co., 246 So.2d 98 (Fla.1971).
The relevant facts cited in Halifax were that Scott & Jobalia (S & J) had borrowed a crane operator from Halifax. Although the operator remained the general employee of Halifax, because he was temporarily assigned to and performed his duties under the control of the S & J employee's hand signals, he became a "borrowed servant" of S & J. In Halifax, there was no written or oral lease.
Before discussing the uncontradicted record facts of our case, we should first consider the impact, if any, of Sherrill v. Corbett Cranes Services, Inc., 656 So.2d 181 (Fla. 5th DCA 1995). This court in Sherrill requires that we consider the provision of the Restatement (Second) of Agency § 227, cmt. c (1958) when the purported "borrowed servant" is the operator of heavy equipment. The Restatement voices the concern that some leased equipment is so valuable that the general employer might be expected to advise his employee to protect the equipment (and use it accordingly) in a manner which might conflict with such employee's duties to the special employer. However, the Restatement should not be read so as to add an additional factor to the Shelby Mutual analysis. It merely explains (and emphasizes at least in the context of expensive rental equipment) why there is a presumption of continuing general employment. But Shelby Mutual recognizes the presumption and establishes three factors to be considered in determining whether the presumption has been overcome. In other words, if the Shelby Mutual test is met, the concern of the Restatement has been overcome.
Further, the facts established by this record show that any potential conflict between the general and the special employer in this case did not exist. First, the general employer chose which crane to send to the job based on the job requirements explained by the special employer. Therefore, it should be assumed that the general employer sent a crane fully capable of performing the work without any reservation concerning the misuse of the equipment. Second, the employee (Egan) testified that with the exception of telling him where the job was and that he would be working for East Coast and advising him of the general nature of the job (hoisting steel beams weighing 14,000 pounds), his general employer gave him no other instruction. Third, in fact there was nothing about the job that would raise any concern involving the safety of the equipment. In that regard, even if the general employer had instructed Egan that "you will work for East Coast, but if East Coast gives you any illegal or unsafe instructions, you *180 will quit its employment and return here, no such instructions were given. If East Coast gave no illegal or unsafe instructions, would such directions by the general employer prohibit Egan from being a "borrowed employee?" I think not.
Now, let's consider the Shelby Mutual factors.
In our case, there was an oral lease of the crane (and operator) based on a telephone request and the long standing business relationship between East Coast Welding and R & J Crane.[2]
Even though the court in Halifax was considering a jury verdict and not a summary judgment, the fact that a crane operator can be a borrowed servant is clear; therefore we should consider the record in this case to determine whether there is any issue of fact that would justify sending this case to the jury.
Shelby established three factors to be considered in determining whether one is in fact a borrowed servant. The first of these is whether or not a contract for hire, express or implied, exists between the employee and the alleged special employer. This relationship was established without contradiction in our case. Egan, the crane operator, testified by deposition:
Q. Tell us what you were told about this specific job, either the morning or the day before.
A. I was told where it was, who I was working for, and I was told I would be setting one or two steel beams, and the beams weighed fourteen thousand pounds, and that was it. (Emphasis added).
Q. Okay. Obviously, you were told East Coast Welding, correct?
A. Yes.
This testimony, I submit, establishes that Egan was "loaned" to East Coast for the purpose of erecting steel beams and, therefore, the presumption of continuing general employment has been overcome.
The second Shelby factor is whether or not the work being done at the time of the injury was essentially that of the alleged special employer. Again, this question is resolved by Egan's testimony:
A. When people rent cranes, they're renting a crane to use as a piece of equipment. They're renting a crane because they have a specific need to fulfill. All I do is operate the crane ... I operate a piece of equipment. And the people that are renting the equipment are in charge of the job. They do the job. I simply make the lifts.
Unquestionably, the erection of the steel beams was a part of East Coast's obligation under its contract on the St. Joseph's Church project. R. & J.'s sole involvement was leasing the crane (and operator) to East Coast.
The third Shelby factor is whether or not the power to control the details of the work being done at the time of the accident resided in the alleged special employer. Egan testified:
Q. So, when you go to a job, you're basically, at their beck and call, correct? In other words, you arrive there with the crane and with yourself, make contact with whoever you're supposed to be working for, and then you, basically, let them tell you what to do, is that correct?
A. That's more or less how it goes. You are at their beck and call.
Brian Phillips, East Coast's foreman on the job, testified that he was in charge of locating the crane and the truck carrying the beam on the job site. The erection of the steel was in the hands of the East Coast's steel workers standing on the truck where the beams were *181 located who would instruct Egan by hand signals.
Egan further testified:
Q. Is there a standard set of signals that you use between yourself and the construction personnel that you're working with when it comes to ... lifting a load?
A. Yes.
* * * * * *
Q. So you are going to rely on somebody knowing the signals?
A. A qualified signalman, exactly.
As to the control being exerted by employees of East Coast at the time of the accident, Phillips testified:
What I saw was as soon as the beam was rigged, or whatever, Nick [appellant herein] gave a boom down signal to make the crane boom down a little bit more, because maybe he thought that the hook was not in the right location. And after he boomed the crane down, he gave a cable up signal. And within just a second or two, it was so quick, the beamas the beam was coming up, kind of went toward Nick, and he had nowhere to go but to jump off the truck.
Egan added:
Q. So you are waiting for a signal from one of the three ...
A. Yes.
Q. Do you remember what signal came from who?
A. I got the boom down signal from Nick.
* * * * * *
Q. Okay. What kind of signal did Nick give you for a boom down?
A. The closed fingers, thumb down.
Q. And you recognized that as the standard signal?
A. Yes.
* * * * * *
Q. And did you receive a signal from Nick to stop booming down?
A. Yes.
* * * * * *
Q. What kind of signal did he give for that?
A. The thumb went back into the hand and there was a slight side to side motion with the fist.
Q. Again, the standard signal that you took to mean stop booming down?
A. Yes.
* * * * * *
Q. What was the next signal given to you?
A. Was the cable up, hoist up.
Q. Was that by Nick?
A. Yes.
Q. And what kind of signal did he give you?
A. The standard hand motion to cable up.
Q. Finger up, twirling?
A. Yes.
Q. And did you immediately commence hoist up?
A. Yes.
Appellants' testimony, except as to how the accident happened, supports both Phillips and Egan:
Okay, I'm on the truck. Me and Al see the cable and the boom. We look up, we look at the operator, we give him a signal (indicating), come on down with the cable.
Cable comes down. Give him a stop signal (indicating), closed fist. Al takes his, goes over to just about where he thinks it ought to be hooked up to divide the load. I take mine, hook it up to divide the load.
We think it is in the right spot. We didn't measure it because we are pretty good in getting the load upright. He gets his cable around the load. I get my cable around the load.
We hook up, ready to choke it. I give the crane operator a signal by pinching my fingers to tighten up on the cable (indicating), which in turn he takes the load up, just the cable up and takes the tension out of the cable. I give him a stop signal, which is a closed fist (indicating), stop, don't do nothing else. That's what that means.
Al turns his back to me. I turn my back to him. I start walking to my end of the *182 beam where I'm supposed to be. He starts walking to his end of the beam where he's supposed to be, which is on the back end of the truck and I'm on the front end of the truck.
Before I can get to my perspective spot so I can take a look and see if the boom is okay and check with my partner and make sure he thinks everything is okay and we're all clear so nobody gets hurt and everything works right, the piece starts moving. The piece is actually the beam. The load starts coming up. I don't know why.
Somebody gives the signal? I don't know. I didn't see nobody.
While this testimony establishes a question of fact as to whether Egan properly followed the signals of the employees of East Coast, it also establishes the fact that Egan was expected to and did perform, except possibly in this one instance, under the direct supervision of East Coast's employees in erecting the steel beams.
It appears, therefore, that the Appellees met the Shelby Mutual test and established Egan to be a borrowed servant. There was no suggestion that a contract for hire did not exist between Egan and East Coast in the context of a "borrowed servant" case. There was also no suggestion that the work being performed at the time of the injury was not that of the special employer. Finally, there was no evidence that the employees of East Coast did not have and exert control over Egan in the details of the work performed. What issue of fact is there concerning Egan's role as a borrowed servant to send to the jury?
If, even after the Shelby Mutual test is met, the mere fact that a piece of heavy equipment is involved in the action creates a fact issue for the jury, then I concede the majority is right. But I do not read Sherrill as requiring that.[3]
The majority's concern about when the "job ticket" was prepared is immaterial. As Halifax points out, there need not be a written or oral leasemerely that a servant is loaned to another. And even if the job ticket was prepared after the work was completed so that the number of hours could properly be recorded for billing purposes, still that is evidence that a lease existed. There is no testimony by anyone that the lease arrangement did not exist and there is testimony from Egan and officers of both R & J and East Coast that there was a lease. Further, it cannot be contended that Egan failed to consent or agree to the "special" employment. He was instructed by his general employer to report the following day to work for East Coast. Further, he was told generally what the job would be. His showing up for work at the proper time and place the following morning and undertaking the job under the supervision of East Coast conclusively establishes his consent. And I do not believe that because Egan physically operated his crane without East Coast telling him how would prevent him from being a borrowed servant.[4]
Finally, I disagree that Egan's statement that he would follow no procedure that he believed was unsafe, including following unsafe hand-signals, would keep him from being a borrowed servant. One would hope that any employee, regular or borrowed, would exercise his discretion not to perform any task or to perform a task in any way that would injure another. Such employee should not do so even if directed to do so by his general employer. If a crane operator displayed *183 such personal integrity that he would follow no order to do an unsafe or illegal act, would this prevent him from being considered an "employee" of even the general employer? Must he be considered an independent contractor? The answer, of course, is no.
I believe the trial court's ruling is correct and I would affirm.
NOTES
[1] A "general employer" is one who contracts directly with the employee, while a "special employer" is one to whom the general employer has loaned its employee; in the latter instance, the employee is known as a "special employee" or as a "borrowed servant." Stuyvesant Corp. v. Waterhouse, 74 So.2d 554 (Fla. 1954).
[2] Richard Bacchiocchi, the president of East Coast explained the procedure in his deposition:

Q. If you needed a crane for a particular job, would you simply get on the phone and call someone at R & J Crane?
A. Correct.
* * * * * *
Q. What type of information would you give him so that he could then decide what kind of crane you needed?
A. The weight of the beam or whatever we was picking up, the length, and how far out he had to rig it.
* * * * * *
Q. Would he always furnish (the operator)?
A. Yes.
* * * * * *
Q. Now, how would you be charged for the crane service?
A. By the hour.
[3] Notice in Sherrill, the discovery was not completed. In our case, this deposition of all the witness relative to the issue discussed herein have been taken. It is probable that this case was far better prepared for summary judgment than was Sherrill.
[4] It is apparent that a special employer "borrows" a servant who can operate a crane precisely because of the operator's special skill in that regard. Further, that is the same reason that the skilled servant is employed by the general employer. His skill, therefore, does not prevent the operator from being an employee, general or special; it merely justifies his employment. And the fact that, because of his special skills, the operator operates his equipment without direction does not prevent him from being a borrowed employee so long as the task he is engaged to perform is under supervision of the special employer and he performs that task under the direction of the special employer. There can be no doubt that Egan was supervised and directed on when, how and where to lift and place the steel beam.